# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RONALD L. JOHNSON**
            **Petitioner-defendant,**

        **v.**                                                **Case No. 13-C-1304**
                                                              **(Criminal Case No. 10-CR-121)**

**UNITED STATES OF AMERICA,**
            **Respondent-plaintiff.**

---

## DECISION AND ORDER

A jury convicted petitioner Ronald Johnson of drug and firearm possession, finding by special verdict that the drug offense involved 280 grams or more of crack cocaine, and Judge Randa sentenced him to a total of 25 years in prison. After an unsuccessful direct appeal, petitioner filed a collateral attack under 28 U.S.C. § 2255, raising a variety of claims, including that his lawyers provided ineffective assistance of counsel. Judge Randa denied the motion, but the Seventh Circuit remanded for an evidentiary hearing on one of petitioner's ineffective assistance claims.

The case was reassigned to me on remand, and I scheduled the case for an evidentiary hearing, but that hearing was delayed for a variety of reasons, including petitioner's attempt to raise additional claims. I concluded that the additional claims exceeded the scope of the remand but in a later decision agreed, for the sake of judicial economy, to consider them. At the evidentiary hearing, petitioner withdrew the ineffective assistance claim on which the case had been remanded, instead electing to press the additional claims he raised on remand—that his lawyers provided ineffective assistance in failing to litigate a motion to suppress and in

requesting a special verdict question on drug weight, and that he is "actually innocent" of possessing the amount found by the jury.

On review of the testimony, the record, and the submissions, I conclude that petitioner has failed to establish any of his remaining claims. Therefore, in addition to concluding that these claims exceed the scope of remand, I deny them on the merits. I first set forth the background and lengthy procedural history of the case before discussing the remaining claims.

## I. FACTS

The operative facts, taken from the Seventh Circuit's decision on direct appeal, are as follows:

> Sometime in late 2008, an informant told Milwaukee police officers that a man known as "Loc" was dealing large amounts of cocaine out of his residence on West Vliet Street, part of the Hillside Terrace Housing Project in Milwaukee. Loc and his girlfriend, Nina Fenske, resided in Unit 301, although only Fenske's name was on the lease. The informant also told officers that Loc had a gun and prior criminal history. Armed with this information, Milwaukee police officers conducted surveillance of Unit 301 for approximately two months. During this time, they observed only Fenske and a man later identified as Johnson coming and going from the residence.

> On the morning of January 29, 2009, police officers arranged to execute a search warrant at the West Vliet address. Officers Todd Bohlen and James Henry set up surveillance in an unmarked police car. They observed Johnson exit the residence and drive away in a silver Chevy Impala. Officers Bohlen and Henry followed Johnson for approximately four blocks before pulling him over, even though Johnson did not commit a traffic violation. Officer Bohlen testified at the suppression hearing that the purpose of this stop was to ensure the preservation of evidence and safety of the officers while they executed the search warrant.

> Officer Bohlen approached Johnson's vehicle and requested his driver's license. In response, Johnson handed Officer Bohlen a driver's license issued in the name of Joshua McGhee.[1] Officer Bohlen then inquired if Johnson had any aliases, to which Johnson replied, "Loc, Ron Loc." Upon request, Johnson also provided his current address on West Vliet Street. After this short exchange,

---

[1]Joshua McGhee was later identified as Johnson's brother.

2

Officer Bohlen asked Johnson to exit the vehicle to conduct a patdown for safety purposes. During this pat-down, Officer Bohlen asked if Johnson had anything on him and Johnson stated that he had some weed in his shoe. Johnson was then placed in handcuffs and taken to Officer Bohlen's vehicle. While Johnson sat in the back seat, Officer Bohlen removed Johnson's left shoe and discovered a small baggie of marijuana.

At this point, Officer Bohlen informed Johnson of the search warrant for his residence on West Vliet Street. Johnson remained in the back of Officer Bohlen's vehicle while Officer Bohlen called for assistance and a police wagon. Approximately thirty to forty minutes after the initial traffic stop, Johnson was transported to his residence in the police wagon, where he remained in handcuffs while officers searched his apartment.

As Johnson waited in the police wagon, Officer Bohlen read a copy of the search warrant to him. Johnson and Officer Bohlen disagree on the ensuing dialogue. Officer Bohlen testified that immediately after he read the search warrant aloud, Johnson confessed that everything in the apartment was his. In contrast, Johnson testified that Officer Bohlen read the warrant and then asked him, "Is there anything that you want to talk to me about, that you want to tell me right now?" (Supp. Tr. at 87.) Johnson responded that he didn't know what Officer Bohlen was talking about, to which Officer Bohlen replied, "Well, you know, if we go in here and find anything we cannot only arrest you but we can arrest who's ever [sic] on the lease." Id. According to Johnson, it was only after Officer Bohlen made this statement that Johnson confessed that anything found in the apartment belonged to him.

. . .

In the end, police officers recovered crack cocaine, marijuana, ecstasy pills, a scale, a firearm, and $19,940 cash from the apartment. The search lasted approximately one hour, after which Johnson was transported to the Milwaukee police department's administration building for booking. There, Johnson was taken to an interview room. According to Johnson's testimony, Officer Bohlen entered the room first. He asked Johnson if he knew about the items found in the apartment, implied that Johnson's girlfriend would be kicked off of housing assistance, and asked if Johnson wanted his girlfriend's daughter to end up in state custody. Johnson maintains that no one else was present during this questioning. According to the government, Officer Andrew Bell advised Johnson of his Miranda rights and interviewed Johnson for approximately forty minutes. Officer Bohlen was present for a majority of the interview but did not enter the room until after Officer Bell began questioning Johnson. During the interview, Johnson admitted that the apartment contained a scale, crack cocaine on a shelf in the bedroom closet, and a safe that held a gun and approximately $20,000. He also discussed his knowledge of drug distribution and estimated that in two years he sold approximately ten to fifteen kilograms of cocaine. He identified his supplier as a man from Chicago named "Simon," and remarked that Simon never

3

brought the cocaine to Johnson's house.

United States v. Johnson, 680 F.3d 966, 970-71 (7th Cir. 2012).

## II. PROCEDURAL HISTORY

### A. The Original Indictment (Case No. 09-CR-83)

In March 2009, the government obtained an indictment charging petitioner with possession of 50 grams or more of cocaine base with intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(A); possession of MDMA (ecstasy) with intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(C); and possession of a firearm by a felon, 18 U.S.C. § 922(g). The case was originally assigned to Judge Stadtmueller. Petitioner, represented by Attorney Peter Kovac, filed a motion to suppress statements based on a Miranda violation. Kovac also raised, but ultimately did not pursue, a challenge to the stop and arrest. The motion was referred to Magistrate Judge Goodstein. While the motion was pending, Judge Stadtmueller recused and the case was reassigned to Judge Randa. Following an evidentiary hearing, Magistrate Judge Goodstein recommended that the motion to suppress be denied, and Judge Randa adopted the recommendation in February 2010. In May 2010, petitioner moved to dismiss on speedy trial grounds. The government conceded the violation but asked for dismissal without prejudice. Judge Randa dismissed the case without prejudice on June 10, 2010.

### B. The Re-filed Indictment (Case No. 10-CR-121)

The government re-charged the case on June 22, 2010,[2] and it was again assigned to Judge Stadtmueller. He did not initially recuse. Petitioner, again represented by Kovac, filed

---

[2]The indictment charged the same three offenses. As to count one, the indictment alleged 50 grams or more of crack, consistent with the law at the time. A few months later, Congress changed the weight threshold for § 841(b)(1)(A) offenses from 50 grams to 280 grams as part of the Fair Sentencing Act ("FSA").

a Franks motion challenging the search warrant.  See Franks v. Delaware, 438 U.S. 154 (1978) (permitting defendants to challenge the veracity of a warrant affidavit in certain circumstances). Kovac did not in the re-filed case challenge the traffic stop and arrest.  Adopting a magistrate judge's recommendation, Judge Stadtmueller denied the Franks motion on December 2, 2010. In the interim, on November 18, 2010, the court removed Kovac as counsel and then appointed a new lawyer, Russell Jones.

The case proceed to trial on January 4, 2011, with Judge Stadtmueller presiding and Jones as defense counsel, and the jury found petitioner guilty of possessing crack cocaine with intent to distribute and possessing a firearm as a felon.[3]  The jury also answered "yes" to a special verdict question indicating that the government had proven the drug offense involved at least 280 grams of crack cocaine.[4]

On April 8, 2011, Judge Stadtmueller recused.  The case again went to Judge Randa, and on July 21, 2011, he sentenced petitioner to 25 years on the drug count and 10 years concurrent on the firearm count.[5]

---

[3]The government moved to dismiss the ecstasy charge (count two) prior to trial.

[4]Judge Stadtmueller submitted to the jury a special verdict asking whether the offense 280 grams or more, and 50 grams or more.  At trial, officers testified that they found 230 grams of crack in the house, and the parties stipulated that on being tested at the crime lab the crack weighed 204 grams.  As discussed above, in his post-arrest statement, defendant admitted selling 10-15 kilograms of cocaine in the past two years, but the government agreed not to introduce that portion of the statement.  The government did introduce his statement that on the day before the search warrant execution he received a kilogram of powder cocaine.  He further stated that he usually cooked the powder into crack, but that he did not do so all at once.  The government relied on this statement in defending the jury's special verdict after trial.

[5]After trial, petitioner challenged the jury's finding of 280 grams, but Judge Randa denied the motion.

5

## C.    Direct Appeal

Petitioner appealed, but the Seventh Circuit affirmed, rejecting petitioner's arguments that: (1) his motion to suppress statements had been improperly denied; (2) the trial judge should have recused himself sua sponte; (3) an aiding and abetting instruction had been given in error; (4) an obstruction of justice enhancement should not have been applied at sentencing; and (5) the sentencing judge improperly determined that he was a career offender.[6] Johnson, 680 F.3d at 969-70.  On the recusal claim, the court followed then-controlling circuit precedent holding that in order to preserve such a claim the defendant must seek a writ of mandamus. Johnson, 680 F.3d at 979, overruled by Fowler v. Butts, 829 F.3d 788 (7th Cir. 2016).

## D.    Section 2255 Motion

Petitioner then filed a pro se collateral attack under 28 U.S.C. § 2255 raising a number of claims, including that Kovac provided ineffective assistance by abandoning a motion to suppress based on the traffic stop; that his appellate counsel provided ineffective assistance in failing to pursue this suppression issue; that Jones provided ineffective assistance in connection with the special verdict question regarding 280 grams of crack cocaine, which allowed petitioner's sentence to be enhanced beyond the 50 grams found by the grand jury; that Jones provided ineffective assistance by improperly advising petitioner regarding his sentencing exposure after a trial; that petitioner was denied the right to an impartial tribunal when Judge Stadtmueller presided over the trial after having previously recused; that

---

[6]Petitioner did not challenge his sentence based on the drug weight issue.  At that time, the Seventh Circuit had held that the FSA did not apply to defendants, like petitioner, indicted before that law went into effect.  United States v. Fisher, 635 F.3d 336, 338 (7th Cir. 2011) (citing United States v. Bell, 624 F.3d 803 (7th Cir. 2010)).  The Supreme Court later held that the FSA did apply to those who offended before the FSA went into effect but were sentenced after.  Dorsey v. United States, 567 U.S. 260 (2012).

6

petitioner's Sixth Amendment rights were violated when his sentence was enhanced based on facts (i.e., prior convictions) not found by the jury; and that his due process rights were violated when he was convicted of an offense (involving 280 grams of crack cocaine) not charged by the grand jury.

Judge Randa denied the motion without a hearing, United States v. Johnson, No. 13-C-1304, 2015 U.S. Dist. LEXIS 152463 (E.D. Wis. Nov. 9, 2015), but on January 20, 2017, the Seventh Circuit remanded. The court of appeals stated:

> Among other claims raised in his § 2255 motion, Johnson contended that his trial counsel, Russell Jones, was ineffective by misinforming him about the maximum sentence he faced by going to trial and advising him to reject a plea offer as a result. According to Johnson, the government had offered a 12-year sentence in exchange for pleading guilty, but Jones advised him to reject the offer because 12 years' imprisonment was the maximum exposure that he would face by going to trial. In fact Johnson faced a maximum sentence of life imprisonment and received a 25-year sentence. In response to Johnson's motion, the government produced an affidavit from Jones, in which he denied telling Johnson that the maximum penalty was 12 years and maintained that Johnson many times had insisted that he did not wish to plead guilty and wanted to take his case to trial.

> The district court denied Johnson's motion without holding an evidentiary hearing, concluding that Johnson had not created a fact dispute about Jones's advice. The court pointed to Jones's affidavit and observed that Johnson's own supporting affidavit did not repeat the allegations about Jones that Johnson included in the motion itself. As a result, the court reasoned, Johnson had not established that Jones misinformed him about his exposure.

> But the conclusion that Johnson had not created a fact dispute was erroneous. Johnson signed his motion under penalty of perjury, so it is considered an affidavit. See Lafuente v. United States, 617 F.3d 944, 946 (7th Cir. 2010). His allegations constituted evidence that Jones misinformed him about the potential penalties, see Kafo v. United States, 467 F.3d 1063, 1068 (7th Cir. 2006), and those allegations, if true, would have entitled him to relief. Although Jones denied Johnson's account in his own affidavit, the district court should have held an evidentiary hearing to resolve the dispute.

> Accordingly, Johnson's request for a certificate of appealability and his motion to proceed on appeal in forma pauperis are GRANTED. The district court's order denying Johnson's § 2255 motion is VACATED and the case is REMANDED for

7

further proceedings consistent with this order.

Johnson v. United States, No. 16-1651, 2017 U.S. App. LEXIS 15339, at *1-3 (7th Cir. Jan. 20, 2017).

**E.   Proceedings on Remand**

On remand, the case was reassigned to me, and I appointed counsel and then scheduled the matter for an evidentiary hearing on the remanded claim. However, the hearing was delayed for a variety of reasons, including petitioner's dissatisfaction with his appointed counsel and his attempts to resurrect other claims.

Petitioner filed a motion for summary judgment on the recusal claim, but after briefing I denied that motion on July 2, 2018, finding that the claim was beyond the scope of the remand. I noted that, under the mandate rule, when an appellate court remands a case to the district court, the district court may not decide issues beyond the scope of the mandate. See Pearson v. Edgar, 153 F.3d 397, 405 (7th Cir. 1998); United States v. Polland, 56 F.3d 776, 777 (7th Cir. 1995). "If the opinion identifies a discrete, particular error that can be corrected on remand without the need for a redetermination of other issues, the district court is limited to correcting that error." United States v. Parker, 101 F.3d 527, 528 (7th Cir. 1996). Further, in such a situation, the appellate court's silence on other arguments implies that they are "not available for consideration on remand." United States v. Husband, 312 F.3d 247, 251 (7th Cir. 2002). In the present case, the Seventh Circuit acknowledged that petitioner raised a number of claims in the § 2255 motion but specifically discussed just one—Attorney Jones's allegedly deficient advice regarding petitioner's sentencing exposure. I concluded that the court's silence on the other issues, including the impartial tribunal claim, indicated that those issues should

8

not be considered on remand.[7]  For the sake of completeness, however, I also addressed the claim on the merits, finding that petitioner failed to demonstrate a due process violation based on Judge Stadmueller's presiding over his trial.

I reset the case for an evidentiary hearing, but petitioner then filed pro se requests to remove counsel, expand the remand, and raise a claim regarding the sufficiency of the evidence regarding drug weight.  On February 7, 2019, I held a hearing, and petitioner agreed to continue with counsel.

## F.    Additional Claims on Remand

On March 4, 2019, petitioner (through counsel) filed a motion to reconsider the July 2, 2018 order and permit him to raise one additional issue from the original § 2255 motion—that Kovac provided ineffective assistance by abandoning a Fourth Amendment challenge to the traffic stop and arrest on January 29, 2009.

On the scope of remand issue, petitioner argued that, while the Seventh Circuit's order discussed only one issue, the court of appeals did not specifically instruct this court to avoid other issues.  Petitioner asked the me to exercise discretion to allow consideration of this one additional issue.  On the merits, petitioner noted that failure to present a meritorious Fourth Amendment claim may constitute ineffective assistance.  See United States v. Owens, 387 F.3d 607, 609 (7th Cir. 2004).  He relied primarily on Bailey v. United States, 568 U.S. 186, 199 (2013), in which the Supreme Court limited the detention of recent occupants to the immediate vicinity of a premises to be searched pursuant to a warrant.  Petitioner acknowledged that at the time of Kovac's representation, there was a circuit split over whether Michigan v. Summers,

_____

[7]My July 2, 2018 order addressed the scope of remand issue in more detail, and I incorporate that discussion by reference.

9

452 U.S. 692 (1981), extended to stops made away from the scene of the search.  In United States v. Bullock, 632 F.3d 1004, 1011 (7th Cir. 2011), decided shortly after petitioner's trial, the Seventh Circuit allowed such a stop. Nevertheless, petitioner argued that Kovac should not have abandoned the issue.[8]  He asked for an evidentiary hearing, indicating that his affidavit also created a factual dispute on this issue.  At a hearing, he could show that Kovac's failure to litigate the issue, raising but then abandoning it for weaker issues absent strategic justification, constituted deficient performance.  Finally, he noted that his post-arrest statements, which could have been suppressed had his trial lawyers pursued the stop motion, provided the basis for a finding that the drug offense involved more than 280 grams of crack.

On March 8, 2019, petitioner filed a motion to amend his § 2255 petition, seeking to add a claim that he is "actually innocent" of his sentence based on 280 grams of crack.[9]  He noted that the parties stipulated to a drug weight of 204 grams and argued that the evidence at trial was insufficient to support the jury's verdict of 280 grams.  Specifically, he argued that (1) given the state of the law at the time (i.e., the FSA was inapplicable to offenders like him under Fisher and Bell) the 280 gram question should not have been submitted to the jury; (2) the government should be held to its stipulation of 204 grams; and (3) the jury's finding was based

_____

[8]On this issue, Judge Randa stated: "With respect to the scope of the Summers detention, neither Johnson's arguments nor the decisions of court of appeals for this circuit regarding the proper scope of a Summers detention preceding and near the time of Johnson's case suggest that Kovac's abandonment of the issue was prejudicial to the outcome of the case. Johnson, therefore, cannot meet his burden of showing that he was prejudiced by Kovac's failure to pursue the suppression issues."  2015 U.S. Dist. LEXIS 152463, at *22.

[9]As indicated, in the original § 2255 motion, petitioner raised ineffective assistance and due process challenges to the submission of the 280 gram question to the jury.  Specifically, he argued that he had been indicted on a charge of 50 grams and that submission of this question caused him to be tried on a charge not found by the grand jury.  Judge Randa found the claim procedurally defaulted.  Johnson, 2015 U.S. Dist. LEXIS 152463, at *33-34.

10

only on his uncorroborated post-arrest statement.  Petitioner acknowledged that he did not in his original motion argue this precise issue, but he did claim a related due process violation regarding the special verdict question.  He further claimed that, given his pro se status, his failure to articulate a (closely related) actual innocence claim should be excused, and that not allowing him to raise this claim would result in a miscarriage of justice.  Finally, he argued that permitting him to amend would not further delay the case or unduly burden the government.

In the amended motion, petitioner withdrew his previous claims of ineffective assistance of appellate counsel ("ground two" in the original motion) and a violation of his Sixth Amendment right to be sentenced based on facts found by the jury ("ground four"). Accordingly, the amended motion contained the following claims: (1) ineffective assistance of counsel based on (a) Kovac's abandonment of a challenge to the stop and arrest, (b) Jones's request for a special verdict question of 280 grams,[10] (c) Jones's misstatement about sentencing exposure, and (d) Jones's failure to raise the stop issue himself; (2) the impartial tribunal claim; (3) a due process claim based on improper amendment of the indictment; and (4) actual innocence of the sentence.

On August 26, 2019, I issued an order granting petitioner's motions in part.  On the scope of remand issue, I indicated that I continued to believe that the remand order in this case limited my consideration to the ineffective assistance claim based on Jones's plea advice. However, I found that judicial economy favored consideration of the additional ineffective

---

[10]The amended motion also alleged that Jones was ineffective in permitting Judge Stadtmueller to preside over the trial.  (R. 86 at 13.)  However, petitioner has not pursued that claim in the subsequent briefing.  Moreover, as discussed in my July 2, 2018 order, petitioner's due process rights were not violated by Judge Stadtmueller's involvement; accordingly, Jones did not provide ineffective assistance by failing to argue otherwise.

11

assistance claim; I had to hold a hearing on the plea-advice issue regardless, so adding the stop/arrest issue would not further delay the case; and hearing the additional claims now would avoid the need for another remand should the court of appeals later disagree with my scope of remand determination. The government argued that petitioner's amended claims lacked merit, but I found it premature to address the merits.

## G. Evidentiary Hearing

On October 30, 2019, I held an evidentiary hearing. At the outset of the hearing, petitioner waived the ineffective assistance claim on which the case had been remanded. (Oct. 30, 2019 Evid. Hr'g Tr. [R. 103] at 2:16-25.) Petitioner then called Attorneys Jones and Kovac and also testified on his own behalf.

### 1. Attorney Jones

Jones testified that he was appointed effective November 23, 2010, and the case proceeded to trial on January 3, 2011. Jones indicated that while this quick turnaround was not ideal, he did have sufficient time to prepare for trial. (Tr. at 5-6, 42.)

Jones testified that, while he did not have a specific recollection, he would have spoken to petitioner about the pre-trial motions litigated by Kovac. (Tr. at 7.) However, by the time he got the case, that was a "done deal"; his focus was getting ready for trial. (Tr. at 9.) He did not seek more time to file motions. (Tr. at 9.)

Jones testified that he did have a discussion with petitioner about the new Fair Sentencing Act ("FSA"). (Tr. at 9.) He filed a motion in limine seeking application of the FSA to petitioner's case, in which he specifically requested that the jury be asked if the offense involved 280 grams or more of crack cocaine. (Tr. at 10; Ex. 122 at 8.) In that motion, Jones

12

acknowledged the Seventh Circuit's <u>Bell</u> decision but nevertheless argued that the Savings Clause should not bar application of the FSA to pending cases. (Tr. at 11; Ex. 122 at 3-4.)

In their joint final pre-trial report, filed on December 28, 2010, the parties agreed as to the substantive jury instructions and the text of the special verdict form, with the latter asking the jury to determine whether the offense involved 50 grams or more of crack cocaine. (Tr. at 12-14; Ex. 121 at 11-12.) However, in the motion in limine, filed later on December 28, 2010, Jones sought something different, i.e., that the special verdict ask the jury if the offense involved 280 grams or more. (Tr. at 15.) In a December 29, 2010 response, the government opposed Jones's request for a 280-gram question, citing <u>Bell</u> and other cases. (Tr. at 15; Ex. 123.)

Asked to explain his strategy for requesting a special verdict question on an amount not charged by the grand jury (Tr. at 16), Jones testified that it was his belief, correct in hindsight,[11] that the FSA should apply; he further believed that the evidence in the case would not establish 280 grams or more; and if the jury found petitioner guilty of 50 grams but less than 280 grams he would have the benefit of that answer should the FSA be found applicable (Tr. at 17). Jones acknowledged that, had it not been for that special verdict 280-gram question, petitioner would later have become eligible for sentence modification under the First Step Act. (Tr. at 17-18.) Jones testified that he did not anticipate the jury coming back with a finding of over 280 grams, particularly in light of the parties' stipulation regarding the amount seized; if the jury had found less than 280 grams, and the FSA later applied, a court could not speculate that the amount was more than that. He conceded that he might have been wrong, but that was his

_____

[11]As indicated in note 6, <u>supra</u>, the Supreme Court later held that the FSA did apply to defendants in petitioner's situation.

13

thought process. (Tr. at 19.) He did not anticipate the jury making the finding it did, given the evidence, including a stipulation that the amount found was less than 280 grams. (Tr. at 19-21.)

Jones testified that the primary defense in the case was that someone else was responsible for the crack cocaine found in the apartment. (Tr. at 20.) Asked why, then, he would ask questions about weight, Jones responded that the jury had to be asked the weight question. (Tr. at 22.) The parties had a stipulation for 204 grams, but that was so the analyst would not have to testify; the government argued that a higher amount was sold beforehand. (Tr. at 22.) The primary issue for the jury was who was responsible for the drugs, not the weight. (Tr. at 44.) Jones admitted that, in hindsight, by giving the jury the option of finding 280 grams he boxed himself in. (Tr. at 45.)

The record of the trial shows that, while the court included the 280-gram question on the special verdict, the court also indicated that the applicability of the FSA would be resolved later if the jury convicted. (Tr. at 24; Ex. 135 at 6.) After the verdict was read, the court directed the parties to develop the record regarding the applicability of the FSA. (Tr. at 25; Ex. 135 at 7.) Jones admitted that he did not file a motion challenging the verdict under Rule 29; he could not say why and conceded that would have been the better course of action. (Tr. at 26.) He did later file a brief asking the court to apply the FSA at sentencing. (Tr. at 26-27.)[12]

On cross-examination, Jones testified that the only drug weight question he wanted was 280 grams; he "didn't want the 50-gram question at all." (Tr. at 31:3.) If 280 grams had been

_____

[12]Although not mentioned at the hearing, the record shows that Jones did later file a motion to vacate part of the jury's verdict, i.e., the "yes" answer to 280 grams. (Case No. 10-CR-121, R. 52.) Judge Randa denied that motion at the sentencing hearing. (R. 60 at 3.)

14

the only question, and the jury had declined to make that finding, petitioner would not have been facing <u>any</u> mandatory minimum penalty. Instead, the judge asked both questions. (Tr. at 31.)

Jones asked, as part of the December 28, 2010, motion in limine, that the court exclude part of petitioner's post-arrest statement in which he told officers he sold 10-15 kilos of cocaine over the past two years. (Tr. at 32; Ex. 122 at 2.) The government agreed not to use this statement. (Tr. at 32-33.) However, petitioner did make additional statements, including that he had received a kilogram of cocaine the day before the search warrant execution, and that the 204 grams the police found was the remainder of that kilogram. (Tr. at 33.)

Jones testified that he had won trials despite the defendant's confession, and that he believed it was possible to overcome petitioner's statement in this case. (Tr. at 34.) In closing argument, Jones argued that petitioner admitted possession of a gun and money found in a safe but denied the drugs (not found in the safe), which he hoped would enhance his credibility with the jury. (Tr. at 35-36.) He also argued that petitioner's prints were not found on the bag containing the drugs. (Tr. at 36.) He recalled that petitioner was adamant that he wanted to go to trial, and they discussed how they could argue the drugs belonged to someone else. (Tr. at 37.)

At the final pre-trial, Judge Stadmueller questioned the defense about the decision not to plead, and petitioner indicated that he wanted to go to trial, irrespective of whether the FSA applied. Judge Stadtmueller further suggested that the FSA should apply in this case. (Tr. at 38-41; Ex. 1.) He then passed the case to give Jones and plaintiff time to discuss. (Ex. 1 at 10.) After the recess, petitioner indicated he was still in a trial posture. (Ex. 1 at 11.) Judge Stadtmueller addressed the sentencing issue by putting both questions—50 grams and 280

15

grams—on the special verdict form (Ex. 1 at 11), indicating the applicability of the FSA would be addressed later (Ex. 1 at 12).

### 2. Attorney Kovac

Kovac testified that when he was initially retained in this case in 2009 petitioner was in custody in Wisconsin, but he was later transferred to Will County, Illinois. (Tr. at 50-51.) Kovac asked for and received an extension of time to file pre-trial motions based in part on the transfer out of state, with the magistrate judge setting a new deadline of May 6, 2009. (Tr. at 52; Ex. 100, 101.)

On May 6, 2009, Kovac filed a motion to suppress statements and physical evidence. (Tr. at 54; Ex. 102.) On May 7, he filed a supporting memorandum, arguing in part that the police stopped petitioner a few blocks from his residence and arrested him without a warrant or probable cause. (Tr. at 55; Ex. 103 at 3.) As a remedy, he sought suppression of petitioner's post-arrest statements. (Tr. at 55; Ex. 103 at 6.)

On May 8, 2009, Magistrate Judge Goodstein issued a recommendation that the motion be denied, finding that it lacked sufficient factual support. (Tr. at 55-56; Ex. 104.) On May 19, 2009, Kovac filed a appeal of the recommendation, indicating that extenuating personal circumstances compromised his ability to meet the court's motion schedule. (Tr. at 56; Ex. 105 at 2.) In this filing, Kovac alleged multiple bases for suppressing petitioner's statements, including that they were the fruit of an illegal arrest. (Tr. at 57; Ex. 105 at 6.) At the hearing in this case, Kovac testified that this was a reference to a Fourth Amendment stop issue. (Tr. at 57.)

On May 22, 2009, Judge Stadtmueller issued an order referring the matter back to the magistrate judge for proceedings on the motions. (Tr. at 57-58; Ex. 107.) On June 29, 2009,

16

Magistrate Judge Goodstein issued an order directing that motions be filed by July 13, 2009. (Tr. at 58; Ex. 108.) On July 13, 2009, Kovac filed a motion to suppress, in which he argued, inter alia, that petitioner's statements should be suppressed as fruit of the illegal detention and arrest. (Tr. at 59; Ex. 109 at 7.) In the body of the motion, he asserted that the police had no justification for the traffic stop. (Tr. at 60-61; Ex. 109 at 3.) Judge Goodstein held an evidentiary hearing on September 2, 2009, directing that Kovac file a post-hearing brief by September 18. (Tr. at 62; Ex. 110 at 111.) Kovac failed to submit a brief by that date, and on September 22, Judge Goodstein extended the deadline to September 25. (Tr. at 63; Ex. 111.)

On September 25, 2009, Kovac filed a three-page, unsigned memorandum. (Tr. at 63; Ex. 112.) In this document, Kovac indicated that in previous submissions he sought suppression of petitioner's statements as fruit of an illegal arrest, then stated: "This illegal arrest theory will not be pursued. The evidence at the September 2 hearing did not support this theory." (Ex. 112 at 2.)

At the hearing in this case, Kovac admitted that he made this concession, despite the fact that during the pre-warrant surveillance of petitioner's residence the officers did not see evidence of drug activity; in obtaining the warrant, the police relied on the statement of an informant that he had been inside Loc's apartment and saw drugs and a gun. (Tr. at 65.) Asked if this theory fell by the wayside given the lateness of the hour and his underdevelopment of the issues, Kovac testified that he did not know what the rationale was. (Tr. at 66.) He indicated that he must have been thinking that the police had probable cause based on what the informant told them. (Tr. at 66, 68.) He testified that, having re-read the transcript, he now questioned his judgment on that. (Tr. at 67.) He explained that he was operating on the assumption that the police knew petitioner was "Loc" before they made the

17

stop.  On reading the transcript, it appeared to him that the police may not have known this at the time of the stop.  (Tr. at 69.)  Kovac explained that the officer testified that based on petitioner's post-stop admission that his nickname was Loc and that he had tattoos (referenced by the informant), the officer concluded that petitioner was the guy the informant was talking about.  (Tr. at 70.)  Kovac testified that if the officers confirmed petitioner was Loc only after the stop they did not have probable cause.  (Tr. at 70.)  Asked if this information—that the police did not know the person they stopped was Loc until after the fact—would support a stop motion, Kovac responded: "I see that now.  I didn't see that before."  (Tr. at 72.)

Kovac acknowledged that, at the time of the suppression litigation in this case, the controlling precedent of Michigan v. Summers held that the police could detain occupants of the subject premises while executing a search warrant, and that the circuits had split over whether the rule could be extended to a person who left the premises and was stopped some distance away.  (Tr. at 72-73.)  The Seventh Circuit later issued a decision endorsing such stops, but Kovac could not have been aware of that at the time.  (Tr. at 73-74.)  Kovac could not recall discussing withdrawal of this claim with petitioner.  (Tr. at 74.)

On October 9, 2009, Magistrate Judge Goodstein recommended denial of the motion to suppress, and under the rules Kovac had 10 days to object.  (Tr. at 75-76.)  On October 19, 2009, Kovac filed a letter with Judge Randa (then assigned to the case) indicating that he attempted to e-file objections on October 16 but was denied access to the system.  (Tr. at 76; Ex. 113.)  On November 25, 2009, Judge Randa sent Kovac a letter indicating that the court would issue a decision by December 15, 2009, and if Kovac wished to appeal it must be done within 7 days.  (Tr. at 77; Ex. 114.)  On December 14, Kovac filed a motion to extend time for filing objections, referencing "family issues."  (Tr. at 77-78; Ex. 115.)  At the hearing in this

18

case, Kovac admitted that he was also experiencing personal health issues. (Tr. at 78.) In the motion, Kovac indicated that he would be able to file objections by December 18, but he failed to do so, and Judge Randa issued a brief order denying the motion. (Tr. at 79.)

On March 8, 2010, petitioner filed with the court a letter indicating he had not spoken to Kovac in five months. (Tr. at 79; Ex. 116.) Kovac testified that he had no reason to dispute this assertion. (Tr. at 80.)

After the case was dismissed and re-issued, on October 7, 2010, Kovac asked for an extension of time to file motions. (Tr. at 80; Ex. 117.) Kovac admitted that he had health issues during this time as well. (Tr. at 81-82.)

On October 12, 2010, Kovac filed a motion to dismiss on speedy trial grounds, and on October 13, 2010, he filed a motion for a Franks hearing. (Tr. at 82; Ex. 118, 119.) He testified that he did not have a specific recollection of a conversation with petitioner about the stop issue. (Tr. at 82-83.) Asked if he had a reason for not filing a stop motion in the second iteration of the case, Kovac speculated that his theory was the same—that the police had probable cause. (Tr. at 83.) The magistrate judge recommended the motions be denied, and Kovac filed no objections. (Tr. at 83-84.) The magistrate judge then granted petitioner's motion for new counsel. (Tr. at 84.)

On cross-examination, Kovac was asked to elaborate on his belief that the officers had not identified petitioner as Loc prior to the stop. (Tr. at 84-85.) He clarified that the officers made the claim that they did know, but their testimony as to what they actually did and what they asked petitioner was inconsistent with that claim. For instance, the officers indicated that they arrested petitioner on a marijuana charge, not the cocaine charge they were investigating. They also made efforts to identify petitioner after the stop. (Tr. at 85.)

19

Kovac conceded that, at the evidentiary hearing before the magistrate judge, the officer testified that the informant pointed "Loc" out to him during their surveillance of the residence, and the officer further testified that he observed petitioner operating two vehicles (R. 110 at 12-13; Tr. at 86-87), one of which petitioner was operating at the time of the traffic stop (R. 110 at 18). Kovac acknowledged that was the officers' position, but he again stated that their actions were inconsistent with that claim. (Tr. at 86-87.) Kovac testified that at the time he must have accepted the testimony that the officers knew petitioner was Loc, but he now saw that their actions were inconsistent with that claim. (Tr. at 88-89.) It was at least something he should have litigated. (Tr. at 89.)

### 3. Petitioner

Petitioner testified that he never told Kovac to give up the stop issue. (Tr. at 90.) He indicated that he was aware of the issue from a lawyer who represented him in state court, and he did not want to waive it. (Tr. at 91.) He testified that he discussed the issue with Jones, but Jones said it had been decided already. (Tr. at 91.)

Petitioner testified that he wrote the court in March 2010, indicating he had not spoken to Kovac in five months, which was an accurate statement. (Tr. at 92-93; Ex. 116.) In October 2010, he wrote letters to Judge Stadtmueller complaining about Kovac. (Tr. at 93; Ex. 127, 128.)

Petitioner testified that Jones showed him a letter regarding the FSA (Ex. 126) and told him that if it applied he would be facing 5-40 years, rather than 10 years to life. (Tr. at 95.) Petitioner testified that he was not aware Jones had filed a motion regarding its applicability. (Tr. at 96.)

Petitioner admitted that he lied when he took the stand at trial and claimed the cocaine

20

in the apartment was not his; the cocaine was his.  (Tr. at 96.)  He also lied about other people living in the residence, including someone called "Simon."  (Tr. at 97.)  Petitioner testified while Simon did not live there, he was not a fictitious character but rather his drug supplier. Petitioner testified that he bought nine ounces from Simon the day before the search warrant execution; he sold two ounces, leaving seven.  (Tr. at 98.)  Petitioner also attempted to offer an explanation for torn baggies found by the police during the search.  (Tr. at 99-100.)  He admitted that in a post-arrest statement he told the officers he bought a kilogram of cocaine the day before the search, but at the § 2255 hearing he claimed that statement was also untrue. (Tr. at 101.)  He testified that he exaggerated the amount because the police wanted him to cooperate and set up a deal for two kilograms.  (Tr. at 103.)

## H.    Post-Hearing Briefing

In his post-hearing briefs, petitioner presses three claims: (1) his lawyers provided ineffective assistance in abandoning the stop motion; (2) Jones provided ineffective assistance in asking for a 280-gram special verdict question; and (3) he is actually innocent of possessing 280 grams or more.  His arguments may be summarized as follows.

### 1.    Stop Motion

Petitioner argues that the circumstances of his stop by the police mirror those in <u>Bailey</u>, in which the Supreme Court limited the rule of <u>Michigan v. Summers</u>—that police executing a search warrant may detain occupants of the premises while searching—to persons in the immediate vicinity of the premises.  <u>Bailey</u> came down several years after petitioner's trial, but petitioner argues that his lawyers should have raised the issue anyway.  He acknowledges that at the time the circuits were split over whether <u>Summers</u> applied to searches conducted away

from the premises, but the Seventh Circuit did not weigh in—upholding such stops, at least in some circumstances, see Bullock, 632 F.3d at 1019-20—until after petitioner's trial. (R. 104 at 9-10.)

Petitioner challenges Kovac's explanation that he must have abandoned the motion because he concluded, after the September 2, 2009 evidentiary hearing, that the police had probable cause for the stop. He points to Kovac's earlier submissions in which he asserted that the police lacked justification for the stop and argues that Kovac instead withdrew the issue in the truncated post-hearing memorandum because he was distracted and/or hurried. (R. 104 at 10-11.) He further argues that nothing at the September 2, 2009 hearing undermined the motion's merit. The officers testified that during nearly two months of surveillance they personally observed no evidence of drug activity, despite the informant's assertions. (R. 104 at 11.) Kovac's cross-examination of the officer at the hearing established that petitioner committed no traffic violations, and that the officers based the stop on the facts averred in the warrant application. The officers saw a man, who matched the description of "Loc" from the warrant affidavit, leave the premises, followed him for awhile, and then conducted a traffic stop. Petitioner argues that this stop was unlawful under Summers and, as in Bailey, counsel could have argued for suppression of his post-arrest statements. (R. 104 at 12.) Instead, Kovac abandoned the issue in favor of a weaker Miranda challenge in the '09 iteration of the case and a poorly-developed Franks challenge in the '10 version. (R. 104 at 12-13.) For his part, Jones wrongly thought Kovac had already litigated and lost the issue. (R. 104 at 13.)

Petitioner argues that, at the time of his counsel's representation, no case in this circuit supported the stop. And, through multiple adjournments and delays, Kovac had plenty of time to litigate the issue. Jones had less time, but he could have asked for more. (R. 104 at 13.)

22

Petitioner concludes that by abandoning the issue Kovac denied him the effective assistance of counsel at a critical stage of the proceedings.  (R. 104 at 13.)

As for prejudice, petitioner argues that if his lawyers had litigated the stop issue he could have obtained suppression of his post-arrest statements, which provided the only basis for the jury's 280 gram finding.  At trial, the parties stipulated that the police found 204 grams in petitioner's apartment, and no witness testified to seeing more.  (R. 104 at 14.)  Petitioner accordingly contends that he has established a reasonable probability of a different outcome. (R. 104 at 15.)

### 2. 280-gram Question

Petitioner argues that through a misapprehension of the law and under-estimation of the government's case Jones made misguided decisions that have had devastating consequences. (R. 104 at 15.)  Petitioner specifically contends that submission of the 280-grams question constructively amended the indictment and inadvertently narrowed his chances of benefitting from the FSA.

First, petitioner argues that Jones's 280-gram special verdict question amounted to a constructive amendment of the indictment, which charged a 50-gram offense.  (R. 104 at 16.) He notes that in the joint final pre-trial report the parties recommended a 50-gram question, but later that day Jones filed a motion in limine asking the court to adopt the FSA's weights with the special verdict reflecting those new weights.  Over the government's objection, the court provided a special verdict asking both questions, 280 grams and 50 grams.  (R. 104 at 17.) Petitioner argues that by submitting the 280 gram question the court amended the charge to one not found by the grand jury, violating the Fifth Amendment.  (R. 104 at 18.)

Second, petitioner argues that Jones's uninformed decision to ask for a 280-gram

23

question allowed the jury to make a finding that foreclosed the possibility that the FSA's new weight threshold could apply to petitioner. (R. 104 at 18.) He contends that a guilty verdict on count one could not have generated a 10-year minimum if either: (a) Judge Stadtmueller had applied the FSA at sentencing, or (b) the FSA became retroactively applicable to petitioner's case at some point. (R. 104 at 18.) He argues that, under these facts, it was not reasonable for Jones to ask for a 280-gram question on the special verdict. (R. 104 at 19.)

Petitioner notes that he was indicted on June 22, 2010; the FSA was signed into law on August 3, 2010; the government did not thereafter seek to supersede to charge 280 grams or more; and it was undisputed that the police seized 204 grams from petitioner's apartment, an amount well above 50 grams but short of the amount needed to trigger the higher penalty range under the FSA. (R. 104 at 19.) Petitioner indicates that Jones's pre-trial work showed that he had some understanding of the FSA; he cited and attempted to distinguish Bell, in which the Seventh Circuit declined to apply the FSA to a defendant sentenced prior to August 3, 2010, but pending on direct appeal at that time. (R. 104 at 19-20.) Prior to trial, Judge Stadtmueller offered to permit the parties to litigate the applicability of the FSA before the case went to a jury, but Jones went ahead with his request to add the 280-gram question to the special verdict, which Judge Stadtmueller granted over the government's objection. Adding this question, petitioner contends, narrowed his chances of obtaining the benefit of the FSA with no upside. (R. 104 at 20.) Petitioner further contends that Jones's testimony at the evidentiary hearing revealed that he did not understand the downside to the question, nor did he appreciate that it resulted in a constructive amendment of the indictment. (R. 104 at 20-21.)

Petitioner also argues that Jones unreasonably discounted the possibility of the jury finding him guilty of 280 grams or more. (R. 104 at 21.) Petitioner notes that, while the

24

government agreed not to introduce his post-arrest statement referencing 10-15 kilograms over the past two years, in cross-examining one of the officers, Jones himself referenced the statement that he had been selling cocaine for two years. (R. 104 at 22.) After the verdict, Jones did not file a timely motion under Fed. R. Crim. P. 29 challenging the 280 gram finding, despite Judge Stadtmueller's invitation that he do so. Rather, several months later, he moved the court to vacate that portion of the verdict, a motion Judge Randa quickly denied. (R. 104 at 22.)

Petitioner concludes that Jones's decision to submit the 280-gram question to the jury precluded relief under Dorsey, decided in 2012, or the First Step Act, which in 2018 made the FSA retroactive. Rather, submission of that question inadvertently narrowed petitioner's chances of ever benefitting from the FSA. (R. 104 at 23.)

### 3. Actual Innocence Claim

Petitioner argues that he is actually innocent of possessing 280 grams or more of crack cocaine. (R. 104 at 23.) Police found 230 grams in his apartment, and the parties stipulated that the drugs weighed 204 grams when tested. (R. 104 at 23-24.) The only other evidence of weight came from petitioner's post-arrest statements, which, he contends, were illogical and did not comport with the evidence. (R. 104 at 24.)

Petitioner summarizes the statement that he received a kilogram of cocaine the day before the search, in which he further discussed how he usually cooked the powder into crack. (R. 104 at 24.) In another portion of the interview, he discussed how much he charged for drugs. (R. 104 at 25.) Given the officers discovery of 230 grams during the search, he wonders where the remainder of the kilo went; the police did not observe activity consistent

25

with sales, nor did they recover cash consistent with the sale of that much.[13] He contends that the jury could only speculate that he obtained a kilo the day before, that he cooked some or all of it into crack, that he sold the missing amount, and that he either hid the proceeds or made less than he told the agents. (R. 104 at 26, citing United States v. Garcia, 919 F.3d 489, 500 (7th Cir. 2019) (stating that a jury cannot speculate its way out of reasonable doubt).)

Petitioner notes that government in closing urged the jury to find more than 50 grams, which the evidence amply supported. Now, though, the government argues for more than 280 grams, relying solely on his uncorroborated post-arrest statement. He cites United States v. Fearn, 589 F.2d 1316, 1321 (7th Cir. 1978), for the proposition "that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." (R. 104 at 27.) He contends that no evidence supports his statement that he bought a kilogram the day before. The officers did not observe foot traffic in and out of the apartment, they did not find packaging consistent with a recent kilogram purchase, petitioner's safe did not contain proceeds consistent with that amount, and no witness testified to seeing that much. (R. 104 at 28-29.) He thus contends that the trial lacked substantial independent evidence corroborating this statement. (R. 104 at 29.)

Petitioner concludes that the corroboration requirement serves a gate-keeping function, preventing juries from convicting on the basis of untrustworthy evidence. (R. 104 at 29.) The rationale for the requirement is that confessions are often unreliable for many reasons, including self-promotion. Juries nevertheless find such statements powerful and may vote to convict based on such statements alone. (R. 104 at 30.)

---

[13]The police found close to $20,000 in petitioner's safe; he argues that the police should have found tens of thousands more had he sold most of a kilogram.

## III.  DISCUSSION

**A.    Scope of Remand**

Before addressing the three issues raised in the post-hearing briefing, I again find that these claims are beyond the scope of the remand.  As the Seventh Circuit has explained, if a case is remanded to correct a discrete, particular error that can be corrected without a redetermination of other issues, the district court is limited to correcting that error.  United States v. Barnes, 660 F.3d 1000, 1006 (7ᵗʰ Cir. 2011).  Silence on other issues raised on appeal means that those issues are not available for consideration on remand.  Id.  That describes the situation here to a "T."  The Seventh Circuit remanded solely for a hearing on the plea advice claim, saying nothing about the other issues raised in the original motion.  Petitioner has now waived the claim on which the case was remanded, meaning there are no issues properly before this court.

The Seventh Circuit has also held that any issue that could have been raised on appeal but was not is waived and, therefore, not remanded.  Id.  This rule also supports the government's position that the additional issues are not properly before this court.  The government further argues that petitioner's constructive amendment and actual innocence claims are procedurally defaulted, as he did not raise them on direct appeal.  (R. 107 at 28, citing Bousey v. United States, 523 U.S. 614, 621 (1998).)  While a defendant may in some cases be able to overcome procedural default by alleging ineffective assistance and/or actual innocence, see, e.g., Rodriguez v. Young, 906 F.2d 1153, 1159 (7ᵗʰ Cir. 1990), petitioner does not in reply specifically respond to the government's argument.  Solely for the sake of completeness and judicial economy, I will address the merits of the three additional claims.

27

**B.      Ineffective Assistance Claims**

To prevail on his ineffective assistance claims, petitioner must satisfy the two-pronged test of Strickland v. Washington, 466 U.S. 668 (1984).  First, he must show that his counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness when measured against prevailing professional norms.  Anderson v. United States, 981 F.3d 565, 572-73 (7th Cir. 2020).  The court's scrutiny of an attorney's performance is highly deferential, eliminating as much as possible the distorting effects of hindsight, and indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Vinyard v. United States, 804 F.3d 1218, 1225 (7th Cir. 2015). Allegations that counsel's performance was generally poor or sub-par will not suffice; rather, the defendant must come forward with specific acts or omissions that constitute ineffective assistance; only then will the court consider whether these acts or omissions fall outside the wide range of professionally competent assistance.  See, e.g., Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010).  A lawyer need not make every conceivable argument, nor is he required to forecast changes or advances in the law, in order to provide effective assistance. See, e.g., Valenzuela v. United States, 261 F.3d 694, 700 (7th Cir. 2001).

Second, petitioner must show that the deficient performance prejudiced his defense, i.e., that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Mendoza v. United States, 755 F.3d 821, 830 (7th Cir. 2014).   When an ineffective assistance claim is based on counsel's failure to present a motion to suppress, the defendant must prove that the Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the

28

excludable evidence.  United States v. Cieslowski, 410 F.3d 353, 360 (7th Cir. 2005); United States v. Jackson, 103 F.3d 561, 573 (7th Cir. 1996).

>    **1.    Stop Motion**

As discussed above, the state of the law was unclear at the time Kovac (and Jones) failed to litigate a stop motion in petitioner's case.  The circuits were split over whether police armed with a search warrant could detain an occupant of the premises to be searched blocks or miles away.  Shortly after petitioner's trial, the Seventh Circuit endorsed such stops, at least in some circumstances.  The Supreme Court did not resolve the split until 2013.  While lawyers are expected to research the facts and the law and raise meritorious arguments based on controlling precedent, they need not anticipate changes in the law.  See United States v. Fields, 565 F.3d 290, 296 (5th Cir. 2009) (collecting cases).  Petitioner argues that counsel just needed to ask the court to apply Summers (R. 104 at 10; see also R. 110 at 15, arguing that the officers acted in contravention of existing Supreme Court case-law), but Summers did not clearly answer the question in his favor, as the Seventh Circuit's Bullock decision illustrates.

In any event, even if effective counsel would in 2010-11 have argued that Summers did not apply to stops conducted away from the premises, petitioner fails to demonstrate that his stop motion was meritorious and that his lawyers provided ineffective assistance in failing to litigate it.  This is so because the record demonstrates that the officers had probable cause—or at least reasonable suspicion—to stop petitioner, so a suppression motion would have failed regardless of the Summers/Bailey issue.  Like the parties, I will refer to the record made at the September 2, 2009 evidentiary hearing in addressing the stop issue.  (Ex. 110.)

Officer Bohlen testified that prior to January 2009 he received information from an informant that an individual known as Loc, living at a specific address on Vliet Street, was

dealing large amounts of cocaine and was also in possession of a firearm at that location. (Ex. 110 at 5-6.) The informant indicated that Loc lived in the apartment with his girlfriend and a young child. (Ex. 110 at 6.) The informant stated that he had been inside the apartment more than a dozen times and provided a detailed description of the layout; he also provided information on two vehicles Loc drove—a silver Chevy Impala and a white Cadillac Escalade. (Ex. 110 at 7.) The informant further provided a physical description of Loc. (Ex. 110 at 9.)

Bohlen corroborated much of the informant's information, including the layout of the apartment. (Ex. 110 at 9-10.) Bohlen then conducted surveillance of the residence for about two months prior to the search warrant execution, identifying and observing Nina Fenske (petitioner's girlfriend) and petitioner coming and going from the apartment. (Ex. 110 at 10-11.) Bohlen specifically testified that he was able to identify Loc as petitioner, Ronald Johnson. (Ex. 110 at 11:18-20.) He explained that he conducted numerous hours of surveillance over different days and times, observing petitioner come and go from the apartment. (Ex. 110 at 12.) The informant was present with Bohlen about three or four weeks into the investigation, and he pointed out Loc to Bohlen as Loc walked out of the building. (Ex. 110 at 13.) Bohlen also observed petitioner operating the vehicles identified by the informant: the white Escalade and the silver Impala. (Ex. 110 at 13.)

Bohlen testified that within 72 hours of executing the search warrant he received information from the informant that the informant was inside the apartment with petitioner, there were ounces of crack cocaine on the kitchen table, and people were stopping over purchasing it. (Ex. 110 at 13.) The informant also indicated that petitioner had a firearm in his waistband. (Ex. 110 at 14.) Bohlen testified that the informant demonstrated familiarity with guns, and that

30

he had provided information to law enforcement previously. (Ex. 110 at 14-15.)[14] Bohlen said he had done more than five successful search warrants with this informant. (Ex. 110 at 16.)

Bohlen testified that he planned to execute the search warrant on January 29, 2009. (Ex. 110 at 17.) He and his partner, Officer Henry, set up surveillance, observing petitioner exit the building, get in the silver Chevy Impala, and drive away. Bohlen testified this was the same vehicle he had observed petitioner drive previously, the same vehicle identified by the informant. (Ex. 110 at 18.) The officers followed for about four blocks before they pulled petitioner over. Asked to describe his motivation in stopping petitioner away from the residence, Bohlen explained that he had executed several search warrants in housing projects; the doors are very thick and difficult to breach, risking destruction of evidence and officer safety. He concluded: "We wanted to stop him away from the apartment, control him, and then go from there." (Ex. 110 at 19:20-21.)

Bohlen testified that after the stop he approached the vehicle and asked petitioner for his driver's license. He told petitioner he looked familiar, asking "what do I know you as" or "what do people know you as." Petitioner responded, "Loc, Ron Loc." (Ex. 110 at 21:12-13.) The license petitioner provided was in the name of Joshua McGhee, but Bohlen testified that after petitioner indicated his name was Loc it absolutely confirmed he was the right person. (Ex. 110 at 21.)

Bohlen had petitioner step out of the car, asking if he had anything on him, and petitioner admitted he had some weed in his shoe. (Ex. 110 at 22.) Bohlen placed petitioner

---

[14]At that point in the hearing, the magistrate judge asked if this testimony was necessary, as probable cause for the search warrant was not at issue. The AUSA responded that "the information that was known to Officer Bohlen as well as the other arresting officer provided probable cause to stop and arrest the defendant." (Ex. 110 at 16:2-4.)

31

in handcuffs, put him in the squad car, and recovered a small bag of marijuana from his shoe. (Ex. 110 at 22.)  Bohlen and Henry called for assistance in transporting petitioner back to the apartment for execution of the search warrant.  (Ex. 110 at 24-27.)  After Bohlen read the search warrant to petitioner, petitioner stated everything in the apartment was his, "it's all mine." (Ex. 110 at 29:9.)  During the warrant execution, officers recovered from the bedroom closet shelf a quarter kilo of crack cocaine and from a safe a loaded 9mm firearm and $19,940 cash. (Ex. 110 at 30.)  After the execution, petitioner was transported downtown where he was interviewed by Bohlen and Officer Andrew Bell.  (Ex. 110 at 31.)

On cross-examination, Bohlen admitted that petitioner committed no traffic violations prior to the stop.  (Ex. 110 at 38.)  He indicated that he stopped petitioner because he matched the description of the person referred to in the search warrant as Loc.  (Ex. 110 at 39.)  He intended to take petitioner into custody as part of the investigation culminating in the search warrant.  He nevertheless approached petitioner like it was a traffic stop.  (Ex. 110 at 39.)  He testified that he had information from the informant tying the person he stopped to the apartment, as well as personal observations during surveillance.  (Ex. 110 at 41.)  After the stop, he questioned the driver about his identity and residence; the driver's license provided was a fake.  (Ex. 110 at 43.)  The driver confirmed his nickname was Loc.  Bohlen also asked the driver if he had tattoos, which the informant had mentioned.  (Ex. 110 at 44.)

On re-direct, Bohlen confirmed that he stopped petitioner to "detain him to execute the search warrant."  (Ex. 110 at 60:10.)  On re-cross, Kovac asked Bohlen if there was a reason to detain people at a different location from the premises to be searched, and Bohlen responded that if they were the target of the warrant, yes.  (Ex 110 at 62.)  He testified that because petitioner was the target here, it was his intention to stop petitioner and detain him.

32

(Ex. 110 at 63.)  Even if the search warrant yielded nothing, he was still in a position to arrest petitioner based on what the informant said, based on probable cause.  (Ex. 110 at 63.)  On questions by the court, Bohlen testified that the basis for the arrest was the probable cause listed in the search warrant, as well as the marijuana in petitioner's shoe.  (Ex. 110 at 64.)

For a warrantless arrest to be reasonable, the police must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the officers reasonably believed that the suspect had committed or was committing a crime.  United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003).  Determinations of probable cause are naturally based on probabilities, and a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.  Id.  In making probable cause determinations, law enforcement officers are entitled to draw reasonable inferences from the facts before them, based on their training and experience.  Id.

Police may initiate an investigatory stop when the officer has reasonable suspicion that a crime occurred.  United States v. Booker, 579 F.3d 835, 838 (7th Cir. 2009) (citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).  When an officer initiates a Terry stop, he must be able to point to specific and articulable facts suggesting criminality so that he is not basing his actions on a mere hunch.  Id.; see also Bullock, 632 F3d at 1012 (noting that reasonable suspicion requires more than a mere hunch but less than probable cause and considerably less than a preponderance of the evidence).

In Bailey, the Supreme Court held that a stop not falling within the spatial limits of Summers might nevertheless be reasonable under Terry.  568 U.S. at 202.  On remand, the Second Circuit upheld the stop under Terry, noting that (1) the police had recently obtained a

33

warrant to search the suspect apartment, providing them with probable cause—a higher standard than reasonable suspicion—to think that the apartment was the site of recent drug trafficking and contained a handgun; (2) minutes before the stop, the detectives watched Bailey exit the premises to be searched and drive away; and (3) Bailey matched the general description of the person from whom the informant had bought drugs. United States v. Bailey, 743 F.3d 322, 333 (2d Cir. 2014);[15] see also Bullock, 632 F.3d at 1011 (find detention supported by reasonable suspicion based on the defendant's association with residence about to be searched pursuant to a warrant, before holding that his detention was also justified under Summers).[16]

The same is true here: the police obtained a warrant to search petitioner's apartment based on probable cause that he sold drugs and possessed a firearm; as the officers were preparing to execute the warrant, petitioner left the apartment and drove away; and petitioner matched the informant's description of the drug trafficker, Loc. After the stop, petitioner admitted possessing marijuana, which gave the police probable cause to arrest. See United States v. Englehart, 811 F.3d 1034, 1042 (8th Cir. 2016); see also Bullock, 632 F.3d at 1021 (finding probable cause to arrest based on discovery of marijuana).

--------------------------------

[15]In reply, petitioner concedes the similarities between Bailey's case and his. He argues that the Bailey informant's information was stronger (R. 110 at 17), but I see no material differences.

[16]The latter holding in Bullock is undermined by the Supreme Court's decision in Bailey, but the former remains good law. In reply, petitioner argues that Bullock is distinguishable because the police conducted the traffic stop in that case because they knew Bullock's girlfriend, who was driving, had a suspended license. (R. 110 at 16-17.) Petitioner overlooks the rest of the court's analysis. While Bullock did not contest the legality of the stop, he did challenge his detention after the traffic stop; the Seventh Circuit found his detention lawful under Terry. 632 F.3d at 1011-12.

34

United States v. Sherrill, 27 F.3d 344 (8th Cir. 1994) provides a shorter route to the same destination.  In that case, a reliable informant told police the defendant sold crack out of his residence.  After conducting surveillance and obtaining further information from the informant, the police got a search warrant.  Just before the police executed the warrant, they saw the defendant exit his residence and drive off.  They stopped him a block away, took him into custody, and transported him back to the residence to conduct the search.  Id. at 345.  The Eighth Circuit declined to extend Summers to a stop conducted away from the premises to be searched.  Id. at 346.  Nevertheless, the court found probable cause for the stop based on the information from the informant, a reliable source, which the police had corroborated through independent investigation.  Id. at 347.

The circumstances here are the same.  The police had obtained a search warrant based on detailed, timely, first-hand information from a known informant, who had provided solid information numerous times in the past.  The police corroborated the informant's statements about the layout of the apartment, who resided there, and the cars Loc drove; the informant also pointed out Loc to Officer Bohlen and demonstrated his familiarity with guns.  While the officers did not during their surveillance observe suspected drug activity, that does not overcome the other evidence.  See United States v. Cherry, 920 F.3d 1126, 1133 (7th Cir. 2019) ("When reviewing probable cause in the case where an informant has provided a tip, therefore, we look at the totality of the circumstances, noting that a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."); see also United States v. Ruiz, 785 F.3d 1134, 1143 (7th Cir. 2015) (holding that the police do not need to see drugs change hands or the

defendant carrying a bag which might contain drugs to justify a stop).[17]

In reply, petitioner argues that the government tries to re-imagine the stop as a valid Terry stop (R. 110 at 12), but the parties litigated the issue that way originally. It is petitioner who seeks to shoehorn the stop into a Summers/Bailey analysis. As indicated in note 14 above, at the September 2009 evidentiary hearing the prosecutor explained that she was presenting testimony to establish probable cause for the stop and arrest. And at the evidentiary hearing in this case, Kovac testified that he believed he abandoned the stop motion based on the strength of that presentation. Petitioner cites testimony from the officers that they conducted the stop to facilitate their execution of the search warrant (R. 110 at 8, 14-15), but the officers' subjective motivations are irrelevant; Fourth Amendment standards are objective. See, e.g., Jackson v. Parker, 627 F.3d 634, 638 (7th Cir. 2010).

For these reasons, I find that petitioner has failed to establish that a Fourth Amendment stop motion in this case would have been meritorious. Accordingly, his lawyers did not provide ineffective assistance in failing to litigate such a motion.[18]

---

[17]In reply, petitioner challenges the extent to which the police corroborated the informant's information, as well as Bohlen's claim that the informant was reliable (R. 110 at 9-12), but he concedes that the police had sufficient information to obtain the warrant (if not to stop him) (R. 110 at 8). Petitioner also argues that Sherrill is distinguishable because the police in that case observed an unusual amount of pedestrian traffic, which the officers in this case did not. (R. 110 at 14.) As discussed in the text, however, a deficiency in one area may be compensated for by a strong showing in another.

[18]In reply, petitioner argues that Kovac's decision to abandon the stop motion was not a strategic one, pointing to his record of blown deadlines, broken promises, and limited communication. (R. 110 at 19.) As Kovac forthrightly admitted at the evidentiary hearing, his representation in this case was far from optimal. But the question before me is whether petitioner has demonstrated ineffective assistance based on Kovac's failure to litigate the stop motion: he has not. Regardless of whether Kovac simply abandoned the motion for no good reason, as petitioner contends (R. 110 at 19), or if he concluded the motion lacked merit, as he speculated at the hearing, the result is the same. At the evidentiary hearing, Kovac floated

### 2.     280-gram Question

If the state of the law regarding Summers was unclear at the time of petitioner's trial, the status of crack cocaine sentencing law was even more confused. The FSA went into effect on August 3, 2010, shortly after defendant was re-indicted for the drug offense he committed on January 29, 2009. On October 20, 2010, the Seventh Circuit held that the FSA did not apply to a defendant sentenced before the effective date of the FSA but pending on direct appeal at that time. Bell, 624 F.3d at 814-15. Petitioner went to trial in January 2011 and, as discussed above, Jones argued that Bell could be distinguished and the FSA should apply to petitioner. Judge Stadtmueller submitted the 280-gram question over the government's objection but also submitted the 50-gram question, which Jones did not want. On March 11, 2011, the Seventh Circuit held that the FSA did not apply to defendants in petitioner's situation, i.e., those who committed their crimes before August 2010 but were sentenced after. Fisher, 635 F.3d at 339 (so holding in the consolidated Dorsey case). Petitioner was sentenced in July 2011. In June 2012, the Supreme Court reversed the Seventh Circuit, agreeing with the position Jones took, i.e., that the Fair Sentencing Act's more lenient penalties did apply to offenders who committed crimes before August 3, 2010, but were sentenced after that date. Dorsey, 567 U.S. at 282.

Petitioner argues that Jones's strategy backfired, as the jury's finding that he possessed more than 280 grams prevented him from later obtaining relief under Dorsey or the First Step Act (which made the FSA retroactive). But "the Sixth Amendment does not require counsel to

_____

the theory that while the police claimed to know the person they stopped was Loc, their actions after the stop suggested otherwise. Petitioner does not press that argument in his post-hearing briefs. In any event, probable cause does not require the police be 100% sure before conducting a stop, and it was entirely reasonable for the officers to confirm the identity of the person they detained, even if they were confident they had the right man.

forecast changes or advances in the law," Valenzuela, 261 F.3d at 700 (internal quote marks omitted); see also United States v. Rezin, 322 F.3d 443, 447 (7th Cir. 2003) ("A lawyer is not to be deemed incompetent merely for lacking the imagination to anticipate arguments or appellate issues that only blossomed after defendant's trial and appeal have concluded, though the clever lawyer would have spotted the bud.") (internal citation and quote marks omitted), "and a strategic decision, even if clearly wrong in retrospect, cannot support a claim that counsel's conduct was deficient." Spiller v. United States, 855 F.3d 751, 756 (7th Cir. 2017) (internal quote marks omitted).

Jones explained that he did not anticipate the jury would find petitioner responsible for more than 280 grams, and I cannot find that unreasonable. Indeed, petitioner now argues that the evidence that he possessed 280 grams or more was so weak that I should vacate the verdict. Under these circumstances, it is hard to see how Jones's prediction that the jury would find a lower amount constituted ineffective assistance.

Jones further explained that he hoped a jury finding of less than 280 grams would preclude a court from later making its own finding that the higher penalty threshold applied if the FSA was deemed retroactive. Of course, we now know that judges are not permitted to make such findings in applying the First Step Act; eligibility is determined based on the defendant's statute of conviction, not to the quantities of crack actually involved in the offense. United States v. Shaw, 957 F.3d 734, 735 (7th Cir. 2020). But just as Jones feared, the government did argue in opposing First Step Act motions that district courts could engage in a more fact-intensive analysis to determine eligibility for re-sentencing, a position some judges accepted. See id. at 738.

It was reasonable for Jones to ask for the 280-gram question because, at the time, it

38

was unclear if the FSA would be retroactive. Indeed, as the government notes, other courts did the same thing given this uncertainty. See, e.g., United States v. Lee, 724 F.3d 968, 974 (7th Cir. 2013) ("Anticipating the possibility that the Supreme Court might deem the revised statutory penalties specified by the 2010 Fair Sentencing Act applicable to defendants, like Lee, who committed narcotics offenses prior to the FSA's enactment but were sentenced after the statute came into effect, the court asked the jury to complete a special verdict form making findings that were pertinent to both the pre- and post-FSA sentencing ranges.");[19] United States v. Feliciano-Galves, 519 Fed. Appx. 66, 67-68 (2nd Cir. 2013) (affirming where the district court in a pre-Dorsey trial submitted the 280-gram question despite the fact that the indictment charged 50 grams).[20] It was also reasonable for Jones to be concerned that, if the FSA did become retroactive at some point, judges would be able to make their own weight determinations, deciding that a case charged under the 50-gram threshold actually involved more than 280 grams. "If an attorney's strategic decisions were sound at the time they were

_____

[19]In reply, petitioner discusses the background of Lee and notes that the Seventh Circuit did not rule on the district court's submission of the 280-gram question. (R. 110 at 21.) The government cited Lee to demonstrate that some district courts submitted this question given the uncertainty over the applicability of the FSA; the government did not argue that Lee specifically approved this approach. As petitioner himself notes, the Supreme Court's decision in Dorsey made that unnecessary.

[20]Petitioner also attempts to distinguish Feliciano-Galves. In that case, the court overlooked the variance from the indictment because it was clear, reviewing the evidence under the more lenient probable cause standard, that the grand jury would have reached the same conclusion as the petit jury with regard to drug quantity. Petitioner argues that the evidence was not so overwhelming here. (R. 110 at 21.) But that is not the issue; the issue is whether Jones provided ineffective assistance in asking for the 280-gram question at that time. The Feliciano-Galves court found the question proper, then went on to find no plain error in the variance from the indictment. The defendant also argued insufficiency of the evidence of 280 grams, but the court disagreed, relying primarily on the defendant's post-arrest statements, id. at 67-68, just as the government does here.

39

made, these decisions cannot support a claim of ineffective assistance." Winters v. Miller, 274 F.3d 1161, 1166 (7th Cir. 2001).[21]

Finally, petitioner cannot establish that Jones provided ineffective assistance by causing a constructive amendment of the indictment. He cites no authority supporting the proposition that asking the 280-gram question during this time, between the passage of the FSA and the Court's decision in Dorsey, amounted to a constructive amendment,[22] and Seventh Circuit case-law addressing somewhat similar circumstances suggests that it does not. See United States v. Trennell, 290 F.3d 881, 888-89 (7th Cir. 2002) (finding no constructive amendment where the court, in a trial conducted shortly after Apprendi came down, submitted a special verdict listing specific amounts even though the indictment was silent as to weight). And, as indicated above, some courts engaged in this practice at the time. See Feliciano-Galves, 519 Fed. Appx. at 67-68; see also United States v. Rodney, No. 10-102, 2014 U.S. Dist. LEXIS 161944, at *11-13 (E.D. La. Nov. 18, 2014) (finding no constructive amendment, and denying related ineffective assistance claim, where court submitted 280-gram question despite indictment's reference to 50 grams).

----

[21]As discussed above, the Supreme Court later validated Jones's belief that the FSA should apply to defendants in petitioner's situation. See Dorsey, 567 U.S. at 282. Petitioner stresses the fact that Jones's decision to request this question precluded him from later obtaining relief under the First Step Act. But Jones could not at the time have predicted that eight years later Congress would pass a law making the Fair Sentencing Act fully retroactive.

[22]Petitioner cites United States v. Galiffa, 734 F.2d 306, 311 (7th Cir. 1984) for the proposition that judicial amendment of the indictment is per se reversible error. (R. 104 at 17.) However, the Seventh Circuit has since held that constructive amendment claims are subject to plain error review. See, e.g., United States v. Pierson, 925 F.3d 913, 922-26 (7th Cir. 2019), vacated on other grounds, 140 S. Ct. 1291 (2020); see also United States v. Cotton, 535 U.S. 625, 631 (2002) (overruling Ex parte Bain, 121 U.S. 1 (1887) to the extent it held a defective indictment deprives the court of jurisdiction).

40

## B.    Actual Innocence Claim

In their post-hearing briefs, the parties cite direct appeal cases setting forth the standards for evaluating the sufficiency of the evidence.  (R. 104 at 26-27; R. 107 at 32; R. 110 at 5-6.)  However, the case is before me now on collateral review.  In his motion to amend the § 2255 petition to raise an actual innocence claim, petitioner cited Perrone v. United States, 889 F.3d 898, 900-01 (7th Cir. 2018), in which the court considered a § 2255 movant's claim that he was actually innocent of causing the death of a person to whom he sold drugs, a finding which triggered an enhanced sentence.  His claim was based on the Supreme Court's post-trial interpretation of the "death results" enhancement in Burrage v. United States, 571 U.S. 204 (2014).  Accordingly, in that case the "actual innocence" claim did "double duty": "it is both what Perrone must show to overcome procedural default and the standard he must satisfy to prevail on the merits of his Burrage claim."  Id. at 903.  The Perrone court held that under these circumstances it was the petitioner's "burden is to show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of causing [the victim's] death."  Id. at 906.

In a later case, the Seventh Circuit expressed doubt that a petitioner's actual innocence claim and claim for relief on the merits can be the same.  Lund v. United States, 913 F.3d 665, 668 (7th Cir. 2019).  The court stated:

> The actual innocence exception is merely a gateway through which a court can consider a petitioner's otherwise barred claims on their merits. Framing the exception as a gateway presupposes that a petitioner will have underlying claims separate from the claim that he is actually innocent. The Supreme Court has not recognized a petitioner's right to habeas relief based on a stand-alone claim of actual innocence.

Id. at 668 (internal citations and quote marks omitted).

41

In any event, petitioner's actual innocence claim fails. As discussed above, the police located 230 grams of cocaine in petitioner's apartment, and in his post-arrest statement petitioner admitted that the amount found was the remainder of a kilogram of cocaine he received from his supplier the day before. (Case No. 10-CR-121, Trial Tr. [R. 48] at 95, 111, 119, 149, 183.) Petitioner bases his actual innocence argument primarily on the lack of corroboration of his post-arrest statement. Under these circumstances, corroboration of a statement is usually "accomplished by presenting evidence that a few of its key assertions are true, which is sufficient to show that the statement as a whole is trustworthy." United States v. Dalhouse, 534 F.3d 803, 806 (7th Cir. 2008); see also United States v. Poe, 556 F.3d 1113, 1126 (10th Cir. 2009) ("Far from requiring the government to corroborate each detail of his statement, as Poe contends, the 'corroboration rule' requires only that the government present evidence establishing the trustworthiness of the extrajudicial confession."). The government satisfied that requirement here.

As the government notes, petitioner knew the exact amount of crack cocaine in the apartment, as well as the location from which it was recovered. (Trial Tr. at 110, 117-18, 182-83.) He also stated that he was moving to an address on Appleton Avenue, and the police recovered numerous receipts listing that address and reflecting the purchase of appliances and furniture. (Id. at 54-58, 64-67, 107.) This sufficiently corroborated the statement.

Petitioner also argues that the police did not during their surveillance make observations consistent with the delivery of a kilogram to his apartment or of sales from his apartment that would leave a remainder of 230 grams. (R. 110 at 3-4.) However, in the post-arrest statement petitioner indicated that while Simon sometimes brought cocaine to Milwaukee for him, he never came to petitioner's residence; instead, they met elsewhere. At trial, Officer Henry

42

testified that they conducted surveillance off and on, not every day, maybe an hour at a time depending on other things that were going on. (Trial Tr. at 68-69.) They did not see everyone that was coming and going. (Id. at 69:4-6.) Nor does petitioner's argument that the police recovered less money than they should have persuade me that the jury's verdict was unsupported.[23]

Finally, I cannot credit petitioner's testimony at the evidentiary hearing in which he claimed that the day before the search warrant he purchased nine ounces (1/4 kilogram) from Simon, then sold two ounces, leaving seven. This is now petitioner's third version of events. In the post-arrest statement, he said he received one kilogram the day before and the 230 grams was the remainder; at trial, he denied receiving the kilogram and further blamed someone else for the drugs found in the apartment; now, he admits that the drugs found in the residence were his, but that the amount he received the day before was less (notably, an amount just under 280 grams). It suffices to say that petitioner has lied so often during the course of these proceedings that it is hard to credit anything he says.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's motion, as amended, is denied, and this case is dismissed. The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner. A COA may issue only if the petitioner makes a "substantial

---

[23]In reply, petitioner references his motivations for making the statements (R. 110 at 6), ostensibly a reference to his claim that he lied to the police in order to enhance his value as a cooperator. (Evid. Hr'g Tr. at 103.) But he made the same claim at trial (Trial Tr. at 172), and the jury apparently rejected it.

43

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the court denies a motion on the merits, the standard for making a "substantial showing" is whether reasonable jurists could debate whether the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 484 (2000). When a district court denies a motion on procedural grounds, the petitioner must show both that jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Id. at 484-85. While perhaps jurists of reason could disagree with my scope of remand finding, they would not find debatable my other determinations, so I decline to issue a COA.

Dated at Milwaukee, Wisconsin, this 9th day of February, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

44